**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

FILED JAN 1 4 2005

CASE NO.:

BOND NICHOLS, on behalf of himself and all others similarly situated,

Plaintiff,

v.

KRISPY KREME DOUGHNUTS INC.; SCOTT LIVENGOOD; and MICHAEL PHALEN,

Defendants.

# 1:05CV00042

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Plaintiff, Bond Nichols ("Plaintiff"), alleges the following as his Complaint in the above-captioned matter. Plaintiff so alleges individually and on behalf of all persons and entities (the "Class") who purchased or otherwise acquired securities issued by Krispy Kreme Doughnuts Inc. ("KKD" or the "Company"), between May 7, 2004, and January 4, 2005, inclusive (the "Class Period").

The allegations contained herein are made upon information and belief, except as to the allegations about Plaintiff and his counsel, which are made upon personal knowledge. Plaintiff's information and belief are based, among other things, on investigations made by and through his attorneys. Such investigations have included, but have not been limited to, the review and analysis of: (a) filings made by KKD with the United States Securities and Exchange Commission (the "SEC"); (b) press releases issued by the Company; (c) newspaper, magazine, and other periodical articles relating to KKD and the allegations contained herein; and (d) other matters of public record.

2

# I.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all purchasers of the common stock of Krispy

Kreme Doughnuts Inc., between May 7, 2004, and January 4, 2005, inclusive, seeking to pursue

remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      KKD is a specialty retailer of doughnuts.  It owns and franchises Krispy Kreme

doughnut stores, where the Company makes and sells over twenty varieties of doughnuts.  Each

of its traditional stores is a doughnut factory, with the capacity to produce from 4,000 dozen to

over 10,000 dozen doughnuts daily.  Its sales channels consist of on-premises sales and off-

premises sales.   The Company has two complementary business units: its company and

franchised stores, which Krispy Kreme refers to, collectively, as Store Operations, and its Krispy

Kreme Manufacturing and Distribution unit.  As of February 1, 2004, there were 357 Krispy

Kreme factory stores in operation, of which 338 are located in the United States.

3.      Throughout the Class Period, the Company misrepresented its financial condition

to the investing public.  Principally, and as set forth in detail below, the Company improperly

accounted for its reacquisition of certain of its franchisees, thereby artificially inflating its pre-tax

income for fiscal year 2004 by as much as $8.1 million.  Put in perspective, this reduction in

income amounts to as much as $0.08 on a per-share basis for FY04.

4.      Prompted by the recent disclosure of these and other, related frauds and

irregularities, the SEC late last year launched an official investigation into the Company.  In the

wake of the announcement of the SEC investigation, the Company disclosed that it would not

timely file its financial statements for the quarter ended October 31, 2004, and has since

expressed concerns about internal controls over its financial reporting.

5.     As a result, the Company defaulted on certain of its loan covenants, raising the possibility that the over $90 million outstanding under its credit facilities would be accelerated by its lenders and become immediately due and payable. Likewise, the Company has guaranteed at least $16.7 million in its franchisees' debt, all of which also threatens to be accelerated since the franchisees have recently run afoul of their own credit agreements.

6.     The Company thus faces the specter of over $100 million in presently due debt, is laboring under a formal SEC investigation, and has been forced to make massive restatements of its earnings. Now struggling to prepare its most recent quarterly report and financial statements, the Company has emerged as a bankruptcy risk, and its stock is trading at new lows, having recently closed at $9.70 -- down from its Class Period intra-day trading high of $26.20. KKD investors have collectively lost millions of dollars as a result of the acts and omissions complained of herein, and, with this action, seek to recover appropriate relief and compensation.

4

## II.

### JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to: (a) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (b) 28 U.S.C. §§ 1331 and 1337.

8.     This action arises under and pursuant to: (a) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (b) Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (c) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     In furtherance of and in connection with the acts alleged herein, Defendants (as defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, the Internet, and the facilities of the New York Stock Exchange ("NYSE").

# III.

## PARTIES

### A.

*The Plaintiff*

11.     Plaintiff purchased the Company's securities during the Class Period, as set forth in his attached Certification, and was damaged thereby.

### B.

*The Defendants*

12.     Defendant Krispy Kreme Doughnuts Inc. is a corporation organized under the laws of North Carolina. It maintains its principle place of business at 370 Knollwood Street, Suite 500, in Winston-Salem, NC 27103. Its common stock trades on the NYSE, a national securities exchange headquartered in New York.

13.     At all relevant times, Defendant Scott Livengood ("Livengood") served as the Company's Chairman, President, and Chief Executive Officer ("CEO").

14.     At all relevant times, Defendant Michael Phalen was the Company's Chief Financial Officer ("CFO").

15.     Herein, (a) the Company; (b) Livengood; and (c) Phalen are sometimes collectively referred to as "Defendants."

# IV.

## SUBSTANTIVE ALLEGATIONS

### A.

*False And Misleading Earnings Announcements
And Quarterly Reports*

16.     On May 25, 2004, the Company released its first quarter earnings announcement,

which stated in pertinent part as follows:

> Krispy Kreme Announces First Quarter Results
> Systemwide Sales Advanced 24%
>
> WINSTON-SALEM, N.C., May 25 /PRNewswire-FirstCall/ -- Krispy
> Kreme Doughnuts, Inc. (NYSE: KKD) today reported financial results for
> the three months ended May 2, 2004, the Company's first quarter of fiscal
> 2005.
>
> First quarter systemwide sales including sales of company and franchise
> stores advanced 24.2%. Total revenues for the quarter, which includes
> sales from company stores, franchise operations and Krispy Kreme
> Manufacturing and Distribution (KKM&D) increased 24.0% to $184.4
> million compared with $148.7 million in the first quarter of last year.
> Revenues from franchise operations grew 40.2% to $7.1 million; KKM&D
> revenues increased 27.5% to $52.7 million and company store sales
> advanced 21.8% to $124.5 million. On a comparable store basis,
> systemwide sales increased 4.0% and company store sales advanced 5.2%.
>
> Income from continuing operations for the first quarter of fiscal 2005
> decreased to $9.8 million, or $0.16 diluted earnings per share, compared
> with $13.1 million in the first quarter last year. For the quarter, income
> from continuing operations and before an impairment charge, increased
> 11.9% to $14.3 million, or $0.23 per diluted share, compared with $12.8
> million, or $0.21 per diluted share, in the first quarter last year, excluding
> the $0.5 million pre-tax benefit related to the arbitration award.
>
> * * *
>
> Commenting on the Company's financial performance, Scott Livengood,
> Chairman, President and Chief Executive Officer of Krispy Kreme
> Doughnuts, Inc. said, "In spite of the changing industry dynamics, we

7

delivered 24% systemwide sales and revenue growth for the quarter. We are focused on our core business and improving company store operations. We remain excited about our growth prospects, both domestically and internationally."

* * *

"We are focused on the Krispy Kreme brand and are committed to elevating the customer experience," stated Livengood. "We have sales and operational initiatives underway and several new products in the pipeline. We expect to realize the benefits from these initiatives in the second half of the year. We are confident that these efforts will serve to create value for our employees, customers and shareholders."

The Company estimates fiscal 2005 earnings per diluted share from continuing operations of between $1.04 and $1.06. The Company now estimates that fiscal 2005 systemwide sales will increase approximately 20% to 25% and systemwide comparable store sales growth will be in the low- to mid-single digits. The Company revised its fiscal 2005 development plans and estimates opening approximately 100 new stores systemwide, including approximately 80 factory and 20 satellite stores.

17.    The financial information set forth in the preceding earnings announcement was also reflected on the Company's Report on Form 10-Q for the quarter ended May 2, 2004, which was filed with the SEC on June 14, 2004.

18.    On August 26, 2004, the Company released its second quarter earnings announcement, which stated in pertinent part as follows:

Krispy Kreme Announces Second Quarter Results
Systemwide Sales Increased 15%

WINSTON-SALEM, N.C., Aug. 26 /PRNewswire-FirstCall/ -- Krispy Kreme Doughnuts, Inc. (NYSE: KKD) today reported financial results for the second quarter ended August 1, 2004.

Second quarter systemwide sales, including sales of company and franchise stores, increased 14.8% compared with the second quarter last year. Total revenues for the quarter, which includes sales from company stores, franchise operations and Krispy Kreme Manufacturing and Distribution (KKM&D), increased 11.5% to $177.4 million compared

8

with $159.2 million in the second quarter of last year. Company store sales increased 18.7% to $123.8 million, revenues from franchise operations grew 13.7% to $6.8 million and KKM&D revenues decreased 4.1% to $46.9 million due to lower equipment sales. On a comparable store basis, systemwide sales increased 0.1% and company store sales increased 0.6%.

Income from continuing operations for the second quarter of fiscal 2005 decreased to $6.2 million, or $0.10 per diluted share, compared with $13.4 million, or $0.22 per diluted share, in the second quarter last year. For the quarter, income from continuing operations before impairment and store closing charges was $7.3 million or $0.12 per diluted share. The pre-tax impairment charge and store closing costs was approximately $1.8 million, or $0.02 per diluted share. During the quarter, nine Company stores closed, comprised of six factory stores and three doughnut-and-coffee shops. In the quarter, the Company reported a loss from discontinued operations of approximately $0.5 million, or $0.01 per diluted share, related to the pending divestiture of the existing Montana Mills operation.

Systemwide sales for the first half of fiscal 2005, including company and franchise stores, increased 19.4%. Total revenues increased 17.5% to $361.8 million compared with $307.8 million for the same period in fiscal 2004. Sales from company stores increased 20.2% to $248.4 million, revenues from franchise operations increased 25.9% to $13.9 million and KKM&D sales increased 10.4% to $99.6 million.

Income from continuing operations for the six months ended August 1, 2004 decreased 39.5% to $16.1 million compared with $26.6 million in the same period last year. Diluted earnings per share from continuing operations was $0.25 in the first six months of the year compared with $0.43 per diluted share in the same period a year ago. For the first half of fiscal 2005, income from continuing operations before impairment and store closing charges was $21.6 million, or $0.34 per diluted share.

For the first half of fiscal 2005, the Company reported a loss from discontinued operations of approximately $34.8 million, or $0.55 per diluted share, related to the pending divestiture of the existing Montana Mills operation.

Commenting on the Company's performance, Scott Livengood, Chairman, President and Chief Executive Officer of Krispy Kreme Doughnuts, Inc. said, "Although we are disappointed with the second quarter financial results, we are optimistic about the long-term growth potential of the business. We are focusing our efforts and resources on initiatives that

9

improve long-term business prospects. We have core strategies with supporting initiatives, a leading consumer brand and great people to address the current challenges. Krispy Kreme has proven over its 67 year history an ability to overcome challenges, and I am confident in our ability to restore our business momentum."

* * *

The Company now estimates that systemwide sales will grow approximately 15% for fiscal 2005 and approximately 10% in the second half of the year. The Company has revised its fiscal 2005 development plans and currently estimates opening approximately 75 new stores systemwide, including approximately 60 factory and 15 satellite stores. The Company is focused on delivering improved results over the long term and, therefore, is not providing earnings guidance for the third quarter or fiscal 2005.

19.    The financial information set forth in the preceding earnings announcement was also reflected on the Company's Report on Form 10-Q for the quarter ended August 1, 2004, which was filed with the SEC on September 10, 2004.

20.    On November 22, 2004, the Company released its third quarter earnings announcement, which stated in pertinent part as follows:

Krispy Kreme Announces Third Quarter Results

WINSTON-SALEM, N.C., Nov. 22 /PRNewswire-FirstCall/ -- Krispy Kreme Doughnuts, Inc. (NYSE: KKD) today reported unaudited financial results for the third fiscal quarter ended October 31, 2004.

Total revenues for the quarter, which include sales from company stores, franchise operations and Krispy Kreme Manufacturing and Distribution (KKM&D), increased 1.4% to $170.1 million compared with $167.8 million in the third quarter of last year. Company store sales increased 9.6% to $121.2 million, revenues from franchise operations decreased 5.4% to $6.2 million and KKM&D revenues decreased 15.7% to $42.7 million. ...

* * *

Net loss for the third quarter was $3.0 million, or $0.05 per diluted share,

10

compared with net income of $14.5 million, or $0.23 per diluted share, in the comparable period last year. Loss from continuing operations for the third quarter of fiscal 2005 was $1.0 million compared with income from continuing operations of $15.0 million, or $0.24 per diluted share, in the third quarter last year. For the quarter, income from continuing operations before impairment and store closing costs was $2.4 million, or $0.04 per diluted share. ...

For the first nine months of fiscal 2005, total revenues increased 11.8% to $531.9 million compared with $475.6 million for the comparable period in fiscal 2004. Sales from company stores increased 16.5% to $369.6 million, revenues from franchise operations increased 14.3% to $20.1 million and KKM&D sales increased 1.0% to $142.3 million. During this period, systemwide sales increased 14.3%.

Net loss for the nine months ended October 31, 2004 was $21.7 million, or $0.34 per diluted share, compared with net income of $40.7 million, or $0.66 per diluted share, in the comparable prior year period. Income from continuing operations decreased to $15.1 million from $41.6 million in the comparable period last year. Diluted earnings per share from continuing operations was $0.24 in the first nine months of the year compared with $0.67 per diluted share in the comparable period a year ago. For the first nine months of fiscal 2005, income from continuing operations before impairment and store closing costs was $24.3 million, or $0.38 per diluted share. For the nine months ended October 31, 2004, the Company reported a loss from discontinued operations, net of taxes, of approximately $36.7 million, or $0.58 per diluted share, related to Montana Mills.

21. The above-referenced earnings announcements and quarterly reports (*see* ¶¶ 16-20, *supra*) were false and misleading to the extent they failed to disclose a series of accounting improprieties by means of which Defendants had purposefully overstated the Company's pre-tax income for fiscal year 2004 by as much as $8.1 million, including but not limited to improperly accounting for income and expense items at Michigan, California, and Charlottesville franchises.

22. The same earnings announcements and quarterly reports were false and misleading for the further reason that, when juxtaposing the financial performance of the

11

Company for fiscal year 2005 against that for fiscal year 2004, they materially overstate the

Company's fiscal year 2004 income by artificially inflating it through the inclusion of the above-

referenced $8.1 million (or some portion thereof, as to quarterly income comparisons).

23.     Belatedly, in a press release dated January 4, 2005, the last day of the Class

Period, the Company conceded that it would have to make $8.1 million in write-downs:

> Krispy Kreme Announces Decision to Restate Financial Statements
>
> WINSTON-SALEM, N.C., Jan. 4 /PRNewswire-FirstCall/ -- Krispy
> Kreme Doughnuts, Inc. (NYSE: KKD - News; the "Company") today filed
> a Form 8-K with the Securities and Exchange Commission (the
> "Commission") disclosing that the Board of Directors of the Company has
> concluded that *the Company's previously issued financial statements for
> the fiscal year ended February 1, 2004 ("fiscal 2004") and the last three
> quarters of such fiscal year should be restated to correct certain errors
> contained therein. Accordingly, such financial statements should no
> longer be relied upon.* The Board of Directors reached this conclusion on
> December 28, 2004, in consultation with, and upon the recommendation
> of, its Audit Committee and management of the Company, and with the
> concurrence of its Special Committee of independent directors, following
> receipt of preliminary conclusions of the Special Committee with respect
> to certain of these matters. Set forth below is additional information
> concerning the restatement decision and the circumstances giving rise to it,
> as well as information concerning other matters relating to the Company's
> financial reporting for the fiscal year ending January 30, 2005 ("fiscal
> 2005") and earlier years. The Audit Committee and management have
> discussed the matters disclosed in this press release with the Company's
> independent auditors. The Company reported the formation and purpose
> of the Special Committee in a Current Report on Form 8-K dated October
> 4, 2004.
>
> In its Current Report on Form 8-K filed December 16, 2004, the Company
> disclosed that certain errors had been identified with respect to the
> Company's fiscal 2004 financial statements and that the Company was
> reviewing potential adjustments to correct such errors, the amounts of
> which were, in certain instances, subject to judgment and interpretation.
> On December 28, 2004, the Board of Directors determined that
> *adjustments totaling between $6.2 million and $8.1 million should be
> made to reduce pre-tax income for fiscal 2004.* The principal adjustments,
> which relate to the Company's accounting for the acquisitions of certain

12

franchisees, are as follows:

-- a pre-tax adjustment of between $3.4 million and $4.8 million to record as compensation expense, rather than as purchase price, some or all of the disproportionate consideration paid to a former owner of the Michigan franchise, who was its operating manager and who subsequently worked for the Company for a short period of time

-- a pre-tax adjustment of approximately $0.5 million to reverse certain income and to record as expense amounts that were improperly accounted for as part of the Company's acquisition of the Michigan franchise

-- a pre-tax adjustment of between $0.5 million and $1.0 million to record as compensation expense, rather than as purchase price, some or all of the disproportionate consideration paid to a former owner of the Northern California franchise, who was its former operating manager and who worked for the Company for a short period of time

-- a pre-tax adjustment of approximately $0.8 million to record as expense, rather than as purchase price, part of the consideration paid to another former owner of the Northern California franchise; this adjustment was proposed subsequent to the Company filing its Current Report on Form 8-K filed December 16, 2004

-- a pre-tax adjustment of approximately $0.6 million to reverse income recorded as a management fee prior to the Company's acquisition of the minority interest in the Northern California franchise

-- a pre-tax adjustment of approximately $0.5 million to record as expense, rather than as purchase price, part of the consideration in the Company's acquisition of the Charlottesville franchise

The first and third adjustments listed above, with a combined pre-tax effect of $3.9 million to $5.8 million, reflect the application of judgment and interpretation in determining the amount of compensation or other expense embedded within acquisitions in which a selling shareholder was employed by the Company for a short period of time and/or received a disproportionately higher purchase price compared to other sellers.

*Restatement of the Company's financial statements to reflect the six principal adjustments referred to above and certain other minor adjustments are expected to reduce net income for fiscal 2004 by between approximately $3.8 million and $4.9 million (between 6.6% and 8.6%) and net income for the fiscal 2004 second, third and fourth quarters by*

*approximately $0.3 million (2.2%), approximately $0.3 million (2.1%) and between approximately $3.2 million and $4.3 million (19.3% and 26.3%), respectively. The adjustments are expected to reduce diluted earnings per share ("EPS") for fiscal 2004 by between approximately $0.07 and $0.08 and diluted EPS for the fiscal 2004 second, third and fourth quarters by approximately $0.01, less than $0.01 and between $0.05 and $0.07, respectively.* As a result of the restatement of the fiscal 2004 financial statements, the Company also expects to restate its financial statements for the first and second quarters of fiscal 2005 to reflect the effects of the restatement of the February 1, 2004 balance sheet; however, the Company's previously reported results of operations for the first and second quarters of fiscal 2005 are not expected to be materially affected by this restatement.

(Emphasis added.)

24.     The Company also announced that as a result of the foregoing restatements and an ongoing investigation of the Company's accounting practices, KKD was in violation of certain financial covenants with lenders, potentially obligating the Company to immediately pay up to $90 million.

25.     On January 4, 2005, the date on which KKD announced its further restatements and the new problems associated with the potential defaults on financial covenants, KKD shares began a significant decline from $12.31 per share on January 3, 2005, to $10.48 per share on January 4, 2005, on volume of more than 10 million shares (or approximately five times average volume for KKD shares). The stock has continued to decline in response to this news, closing at $9.59 per share on January 7, 2005.

B.

*Related Frauds Concerning Other Transactions*

26.     The above-referenced earnings announcements and quarterly reports (*see* ¶¶ 16-20, *supra*) were false and misleading for the further reason that they failed to disclose the truth

14

about a series of other transactions, including several suspect reacquisitions. By concealing the truth about these matters, the Company's quarterly and fiscal year earnings results were overstated, and its liabilities understated.

27. For example, the Company reacquired Dough-Re-Mi, a deeply indebted Michigan franchise, consisting of seven Krispy Kreme retail outlets. Defendants artificially inflated the purchase price of the outlets to cover debts owed by Dough-Re-Mi to the Company, and then proceeded to improperly record the same money as income, thereby artificially inflating the Company's quarterly and annual (FY04) earnings.

28. Defendants also consummated several transactions engineered to benefit KKD insiders, while simultaneously causing the Company's financials to be materially misstated. For example, in June 2003, the Company reacquired rights to Dallas, Texas, and Shreveport, Louisiana, stores, falsely representing to investors that the stores were valued at $67 million, a massive premium over the typical selling prices of Krispy Kreme franchises. The Company failed to disclose that the specific sellers of the Dallas franchise were in fact multiple Krispy Kreme insiders.

29. By way of a final example, in February 2004, the Company reacquired the Golden Gate KKD franchise in Northern California. KKD and Defendant Livengood failed to disclose, however, that Livengood's wife was a $1.5 million beneficiary of the transaction.

30. By failing to disclose the preceding facts (*see* ¶¶ 27-29, *supra*) in the above-referenced earnings announcements and quarterly reports (*see* ¶¶ 16-20, *supra*), Defendants rendered those announcements false and misleading within the meaning of the federal securities laws.

15

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

31.     At all relevant times, the market for KKD common stock was an efficient market for the following reasons, among others:

     a.     KKD common stock was listed and actively traded, on the NYSE, a highly efficient market;

     b.     As a regulated issuer, the Company filed periodic public reports with the SEC;

     c.     KKD stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

     d.     KKD regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

32.     As a result, the market for KKD securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of KKD common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## VI.

## NO SAFE HARBOR

33.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## VII.

## SCIENTER ALLEGATIONS

34.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in

17

detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company and its business practices, their control over and/or receipt of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning KKD were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances, and operations. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Defendants.

35.    Defendants engaged in such a scheme to inflate the price of KKD common stock in order to: (a) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; and (b) enhance the value of their personal holdings of KKD common stock and options.

## VIII.

## CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rule of Civil Procedure on behalf of a Class, consisting of all persons who purchased or otherwise acquired KKD securities between May 7, 2004, and January 4, 2005, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, members of the immediate

18

family of each of the Defendants, any subsidiary or affiliate of KKD and the directors, officers, and employees of KKD or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, KKD common stock was actively traded on the NYSE (an open and efficient market) under the symbol "KKD."  Record owners and other members of the Class may be identified from records maintained by the Company and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

       a.     whether the federal securities laws were violated by Defendants' acts and

19

omissions as alleged herein;

b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition, and prospects of KKD;

d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance, and prospects of the Company;

e.     whether the market price of KKD common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

20

## IX.

## COUNTS

### FIRST CLAIM

### (Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants)

42.     Plaintiff repeats and realleges each and every allegation contained above.

43.     Each of the Defendants: (a) knew or recklessly disregarded material adverse non-public information about the Company's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports, and other public representations of and about KKD.

44.     During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45.     Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of KKD stock during the Class Period.

46.     Plaintiff and the Class have suffered damage in that, in reliance on the integrity of

21

the market, they paid artificially inflated prices for KKD stock. Plaintiff and the Class would not have purchased KKD stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

## SECOND CLAIM

### (Violation Of Section 20(a) Of The Exchange Act Against Defendants Livengood and Phalen)

47.     Plaintiff repeats and realleges each and every allegation contained above.

48.     The individual Defendants (Livengood and Phalen) acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act. By reason of their senior executive and/or Board positions they had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

49.     By reason of such wrongful conduct, the Defendants Livengood and Phalen are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of KKD stock during the Class Period.

## X.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.     Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding compensatory damages in favor of Plaintiff and the other Class

22

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees ands expert fees; and

4.      Such other and further relief as the Court may deem just and proper.

## XI.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 14, 2005

Respectfully submitted,

By: _____

William L. Hill (NCSB # 21095)
MOSS, MASON AND HILL
101 W. Friendly Ave., Ste. 602
Greensboro, NC 27401
(336) 370-1282
Fax (336)271-6838

Ralph M. Stone
Thomas G. Ciarlone, Jr.
SHALOV STONE & BONNER LLP
485 Seventh Avenue, Suite 1000
New York, NY 10018
(212) 239-4340
Fax (212) 239-4310

Alfred G. Yates, Jr.
Gerald L. Rutledge
LAW OFFICE OF ALFRED G. YATES, JR., P.C.
519 Allegheny Bldg., 429 Forbes Avenue
Pittsburg, PA 15219
(412) 391-5164
Fax (412) 471-1033
*Attorneys for Plaintiff*

23

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Bond Nichols ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the class action complaint in this matter (the "action") and authorizes its filing and is willing to serve as a lead or named plaintiff in the action on the basis of the allegations in that complaint or a substantively similar or related complaint or amended complaint to be filed.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in Krispy Kreme Doughnuts, Inc (KKD) that is/are the basis of this litigation is/are listed on the attached schedule.

5.    During the three years prior to the date of this Certificate, Plaintiff has sought to serve ha plaintiff served as a representative party for a class in a case under the federal securities laws as follows: (list, if any)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12 day of January, 2005.

_Bond Nichols_
Plaintiff

## Schedule

In Re: Krispy Kreme Doughnuts Inc Securities Litigation

Transactions of Bond Nichols
Sold 10 puts KKD on 1/4/04
Acquired 1,000 shares KKD on 8/23/04 @ $35.00/share
Sold      1,000 shares KKD on 11/23/04 @ $10.00/share